# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-01-00503-CV

---

**Lola Garcia and Willie Thompson, Jr., Appellants**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

---

**FROM THE DISTRICT COURT OF CALDWELL COUNTY, 274TH JUDICIAL DISTRICT
NO. 98-FL-271, HONORABLE J. CHARLES RAMSEY, JUDGE PRESIDING**

---

The Texas Department of Protective and Regulatory Services (Athe Department@) sued to terminate the parental rights of Lola Garcia and Willie Thompson, Jr.. The trial court issued a decree terminating their rights based on a jury=s findings that (1) they knowingly placed or allowed their children to be placed in conditions that endangered their physical or emotional well-being; (2) they engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children; and (3) termination is in the best interest of the children. *See* Tex. Fam. Code Ann. ' 161.001(1)(D) & (E), (2) (West Supp. 2002). Both Garcia and Thompson appeal the termination of their rights. Garcia contends that (1) the evidence was factually insufficient to support the jury=s findings and (2) the children=s attorney *ad litem* had a conflict of interest that interfered with his ability to provide adequate representation. Thompson argues that the evidence adduced at trial was both legally

and factually insufficient to support the jury=s findings. We will affirm the trial court=s decree terminating the parental rights of both appellants.

## FACTUAL AND PROCEDURAL BACKGROUND

Lola Garcia is the mother of seven children, A.T., T.T., F.G., S.G, L.G., B.H., and B.G.,[1] all minors[2] who are the subject of her appeal. Willie Thompson is the biological father of Garcia=s two oldest children, A.T. and T.T. Garcia and Thompson resided together for two brief periods, just before the birth of A.T. and again before and immediately following the birth of T.T. Because of the significant time he has been incarcerated after T.T.=s birth, Thompson has seen his children on only one occasion. He has been charged with theft, forgery, burglary, and criminal mischief on five separate occasions since 1983 and is currently serving a thirty-five year sentence in New Boston, Texas. Garcia currently resides with Santos Raphael Gomez, the biological father of her youngest child, B.G. The four middle children, F.G., S.G., L.G., and B.H., were fathered by Luis Garcia, whose whereabouts were unknown at the time of trial. Lola Garcia was still married to Luis Garcia at the time of trial.

---

[1] In the record, Garcia=s two youngest children are listed at various times with different surnames and the same surnames. We have assigned them initials that correspond with the court=s decree terminating the parent-child relationship.

[2] As of May 30, 2001, the date of the decree, A.T. was thirteen, T.T. was twelve, F.G. was ten, S.G. was eight, L.G. was six, B.H. was four, and B.G. was two.

The Department first became involved with this family in July 1989, when they received a referral alleging neglect and abandonment of A.T. Garcia testified that the report was simply untrue. In February 1995, the Department received information that A.T. was being kept out of school to care for the younger siblings. The Department conducted an investigation but, according to caseworker Elida Perez, the claim was ruled out because there were family members who lived close by. The Department received another referral in August 1996 alleging the physical abuse of A.T. and T.T. by their mother, Lola Garcia. A.T. was found to have a black eye and scratches. In addition, the Department reported that all of the children were filthy, infested with lice, and wearing the same clothes for many days at a time. Perez testified that the case was closed after a brief investigation, but that the reason for its closure was the relocation of the family. Had the family not moved to another area of the state, Perez stated, the case would have been kept open and investigated further.

In October 1997, an anonymous call was made to the local police department alleging that Garcia=s children had been left unsupervised at the family home and were playing in the street. Mary Beth Miller, a volunteer with the Victim Services Assistance Team in Lockhart, arrived at Garcia=s home with police shortly after midnight. As reported, the children were without adult supervision. Miller testified that the home was in disrepair, the children were filthy, and there was no food in the home. Further, there was only one bed in the home, and Miller assumed that the children slept on the floor or the single broken down couch she observed.

Garcia was located later that night by the police. Miller testified that Garcia was combative and intoxicated when she was brought home. At trial, Garcia denied that she had been intoxicated that

3

night. After the incident, Garcia signed a safety plan stating that she would not leave the children unsupervised again. Miller maintained a relationship with the children from October 1997 through August 1998. She testified that during her visits with the children, they were always dirty, lice infested, and had a foul odor. She never saw conditions at the Garcia home improve.

In August 1998, the Department investigated another call alleging neglectful supervision at the Garcia home. The call was made at 11:19 p.m. The investigation revealed that Garcia had left the children with her younger brother, James, who had recently been released from prison, while she and Gomez went to Mexico. James left the children unsupervised at home. The police officer who arrived at the scene, Angela Allred, reported that the home was filthy, infested with cockroaches, and had a bad smell. Further, trash was scattered everywhere and there was no edible food in the house. The children were removed from the home by the Department. Linda Juarez, the caseworker assigned to the case, testified that upon arrival at the shelter, the children were very hungry and hoarded the food that was provided. Further, they were dirty and lice infested. She stated that initially, the children were afraid to leave their home because they said Garcia would beat them up if they went to stay with relatives. When Juarez contacted nearby relatives, none of them would take the children because they feared retaliation from Garcia. The children were kept in foster care for one year while Garcia completed a service plan assigned to her by the Department. Among other tasks, Garcia attended parenting classes and attended therapy sessions with psychologist Stan Harlan.

Garcia gave birth to B.G. in December 1998. In December 1999, Garcia was arrested and B.G. was found covered in urine and feces, with severe diaper rash. Those factors coupled with Garcia=s

4

history of neglect led the Department to conclude that B.G. was in immediate danger. B.G. was removed in January 1999, but returned to Garcia in March 1999. The six other children were returned to her in August 1999, at the urging of Garcia=s therapist. At the same time, the children joined their mother in therapy with Harlan. In November 1999, Garcia and her children concluded their therapy sessions with Harlan.

On the evening of December 7, 1999, Garcia drove her seven children, a friend named Guadalupe Gutierrez, and Gutierrez=s two children to Austin. Garcia testified that none of the children wore seatbelts. Upon their arrival in Austin, Garcia was approached by a police officer and arrested because of an outstanding warrant. There is conflicting testimony as to whether Garcia or the police allowed the children to be left with Gutierrez while she was in jail.

The following night, the Department received an anonymous referral alleging neglectful supervision of Garcia=s children. Primarily, there was concern that Gutierrez was an inappropriate care giver. Indeed, the Department was then working on a family safety service plan with Gutierrez, and there were prior reports of neglectful supervision and sexual abuse of Gutierrez=s own children. There was also a concern that Garcia had been driving while intoxicated on the night she was arrested. Although there is no mention of Garcia=s intoxication in the police report, four of the children reported that their mother had been drinking that evening. Additionally, the Department was informed that physical violence and inappropriate disciplinary techniques were being used in Garcia=s home. All seven of Garcia=s children were removed from Gutierrez=s care on December 9, 1999. Tara Hopkins, the lead investigator assigned to the Garcia family in December 1999, testified that when she removed the children, they were dirty, lice infested, and wearing soiled clothing. She testified that B.G.=s diaper was Aso full of feces and urine it was coming up and

5

getting on her shirt and clothing.@ Several of the children told Hopkins that there was no food in the house. In addition, A.T. told Hopkins that her mother had hit her with a wire hard enough to leave bruises. The other children confirmed her story. A.T. also voiced a fear that her mother was becoming more and more violent. The children have not been returned home since the 1999 removal. At the time of trial, all seven children had been in foster care for approximately one and one-half years.

The two oldest children, A.T. and T.T., stated that they wished to return home. They are uncooperative with the Department and have run away on several occasions. They have made little progress in therapy since their removal from Garcia=s home. The five younger children are doing well in the care of the Department. Three of the five express a desire to remain with their foster families. The fourth, who was four at the time of trial, has expressed a desire both to remain with her foster parents and to return to Garcia.[3] The five younger children have all progressed in therapy since their removal.

## DISCUSSION

*Standard of Review*

A parent-child relationship may be terminated if the court finds by clear and convincing evidence that (1) the parent has engaged in any of the specific conduct enumerated in the family code as grounds for termination and (2) termination is in the best interest of the child. *See* Tex. Fam. Code Ann. ' 161.001(1), (2); *Texas Dep=t of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Clear and convincing means the measure or degree of proof

---

[3] The youngest was nonverbal at the time of trial.

that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *Leal v. Texas Dep=t of Protective & Regulatory Servs.*, 25 S.W.3d 315, 319 (Tex. App.CAustin 2000, no pet.), *disapproved on other grounds*, *In re C.H.*, 45 Tex. Sup. Ct. J. 1000, 1005, 2002 Tex. LEXIS 113, at \*1, 25 (July 3, 2002).

In this case, the termination of the parental rights of both appellants is based on sections 161.001(1)(D) and (E) and (2) of the family code. *See* Tex. Fam. Code Ann. ' 161.001(1)(D) & (E), (2). These sections provide:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1) that the parent has:
>
> > (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
> >
> > (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child . . . and
>
> * * *
>
> (2) that termination is in the best interest of the child.

*Id.* In an involuntary termination proceeding, Aendanger@ means conduct that is more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *See Boyd*, 727 S.W.2d at 533. However, the child need not suffer actual physical injury for a finding of endangerment to

be made. *Id.* ARather, >endangerment= means to expose to loss or injury; to jeopardize.@ *Id.*; *see also In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *Leal,* 25 S.W.3d at 320. Endangerment can occur through both the acts and omissions of the parent. *Phillips v. Texas Dep=t of Protective & Regulatory Servs.*, 25 S.W.3d 348, 354 (Tex. App.CAustin 2000, no pet.). Moreover, neglect can be just as dangerous to the well-being of a child as direct abuse. *M.C.*, 917 S.W.2d at 270; *Phillips*, 25 S.W.3d at 354. Further, a parent=s endangering conduct toward one sibling is sufficient to support termination of a parent=s rights to all of her children. *Lucas v. Texas Dep=t of Protective & Regulatory Servs.,* 949 S.W.2d 500, 503 (Tex. App.CWaco 1997, writ denied); *see also Director of Dallas County Child Protective Servs. Unit v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.CDallas 1992, no writ).

The Texas Supreme Court has recognized the following factors that may be considered in determining whether termination of parental rights is in a child=s best interest: (1) desires of the children; (2) emotional and physical needs of the children now and in the future; (3) emotional and physical danger to the children now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the children; (6) plans for the children by these individuals; (7) stability of the home or proposed placement; (8) acts or omissions of the parent; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 372. This list of factors is not exhaustive; other factors may be considered when appropriate. *Leal*, 25 S.W.3d at 321. Additionally, a fact finder is not required to consider all of the listed factors and may reasonably form a strong belief or conviction regarding the interest of the child in the absence of evidence about some of these factors. *See C.H.*, 2002 Tex. LEXIS 113, at *27-28.

In determining the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the finding and disregard all evidence to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re S.H.A.*, 728 S.W.2d 73, 90 (Tex. App.—Dallas 1987, writ ref=d n.r.e.).

The supreme court recently clarified the appellate standard of review for reviewing factual sufficiency of the evidence in parental termination cases. *See C.H.*, 2002 Tex. LEXIS 113, at *23-24. In deciding whether the evidence is factually sufficient, this Court reviews the record to determine if the evidence is such that Aa fact finder could reasonably form a firm belief or conviction about the truth of the State=s allegations.@ *Id.* at *23. In doing so, we retain the deference that an appellate court must have for the jury=s fact-finding mission. *Id*. at *26. In conducting our review, we must be mindful of the fact that a firm belief or conviction is a standard short of that of beyond a reasonable doubt. *Id*. The interests of the child must not be sacrificed to maintain the rights of the parent. *Id*. at *27.

We will first address Garcia=s claim of factual insufficiency, then Thompson=s legal and factual sufficiency challenges. Finally, we will address Garcia=s claim concerning the attorney *ad litem=s* alleged conflict of interest.

### *Lola Garcia*

Garcia=s factual sufficiency challenge raises two issues: (1) whether the evidence adduced at trial was sufficient to support a finding of endangerment, and (2) whether the evidence was sufficient to support a finding that termination of her parental rights was in the best interest of her children.

9

The Department presented testimony from four of the family=s therapists, three caseworkers, two police officers, two of the children, one of the current foster parents, a medical specialist, a volunteer with the Victim Services Assistance Team, one of the children=s school counselors, an expert witness on domestic violence and abuse, and a CASA[4] volunteer, Rosa Hernandez, who was also guardian *ad litem* for the children. The testimony of Garcia=s psychologists, Dr. Elizabeth Cortez and Dr. Michael McNeil, revealed that Garcia uses denial and avoids blame by not accepting responsibility for her actions. Dr. Tom Kubiszyn performed a complete diagnostic on L.G., and testified that L.G. is afflicted with both post-traumatic stress disorder and generalized anxiety disorder. The child was six years old at the time the diagnosis was made. Claudia Shroyer has counseled all of the children except B.G, who is nonverbal. She stated that the children reported physical abuse to her and that three of them stated that they would prefer to stay with their foster families than to return home. All of these professionals testified that it would be in the best interest of the children to remain in foster care. Two of them stated that Garcia had endangered her children through her acts and omissions.

Three caseworkers confirmed the Department=s reports that Garcia=s home was filthy and laden with cockroaches. They stated that when they encountered the children at Garcia=s home, they were filthy, lice-infested, hungry, wearing soiled clothing, and frequently unsupervised. The testimony of volunteers Mary Beth Miller and Rosa Hernandez and police officer Angela Allred corroborated that of the

_____

[4] CASA stands for Acourt appointed special advocate.@

caseworkers. All three of these witnesses testified that Garcia endangered the children and that they believed remaining in the care of the Department would be in the best interest of the children.

A school counselor who worked with the two oldest children testified that A.T. and T.T. told her that they had been kept home from school to care for their younger siblings and that all of the children were Awhipped@ by their mother. The videotaped testimony of two of the middle children, F.G. and S.G., revealed physical abuse and violence in the home, and suggested excessive partying by Garcia and Gomez, including the use of alcohol and illicit drugs. The children reported that Garcia beat them with her hand, a shoe, and tree branches, and that Gomez whipped them with a board, a stick, or a belt. Both children stated that they wish to remain in foster care. Dr. Debra Freedenberg, the medical director for the Genetics Institute of Austin, testified that the youngest child, B.G., has Afetal alcohol affects,@ a condition caused from the mother consuming alcohol during pregnancy. As a result, the child suffers sensory deprivation and developmental delays. She requires specialized attention to attain optimal functioning. The Department has placed the child with foster parents who are trained in the specialized skills B.G. needs.

Garcia offered her own testimony along with that of her local pastor, Benjamin Smith, and one of her therapists, Stan Harlan. Garcia testified that this lawsuit, and the prior action taken by the Department, was the result of a conspiracy against her. According to her, she feeds the children three meals each day, she and Gomez are not physically abusive toward each other or the children, and she has never kept the older children home from school to babysit the younger children. She stated that she believes receiving a good education is important and that the only reason the children were kept home from school was physical illness. Further, according to Garcia, the only reason she left her children with Gutierrez when

11

she was arrested in 1999 was because the police told her to. Finally, Garcia testified that she and Gomez do not drink or use drugs. At trial, when confronted with evidence that her youngest child suffers from fetal alcohol affects, she repeatedly asserted that she did not drink any alcohol during that pregnancy.

The pastor of Garcia=s church, Benjamin Smith, testified that he knows Garcia and her two oldest children well. He testified that because his visits to the Garcia home were unannounced, he saw the true state of the household on numerous occasions. He said Garcia=s housekeeping was Areasonably well done@ and that the children did not seem to be malnourished. Additionally, Pastor Smith testified that he had no reason to believe that Garcia=s children were being abused.

Stan Harlan testified that Garcia was very responsive to therapy and displayed substantial concern for her children. Further, Harlan stated that the children never reported to him that they were disciplined inappropriately. On his visits to their home, he said that neither the home nor the children were filthy. Finally, Harlan testified, contrary to Garcia=s own testimony, that Garcia admitted to him that she drank alcohol while she was pregnant with her youngest child.

After careful review of the entire record, we are persuaded that the evidence is such that a fact finder could reasonably form a firm belief or conviction that the State=s allegation were true, and thus factually sufficient to support the jury=s findings that Garcia: (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. A finding of either ground would support termination. Additionally, we hold that the evidence was factually sufficient to support the jury=s finding that termination

12

of Garcia=s parental rights was in the best interest of all the children. We overrule Garcia=s first point of error.

*Willie Thompson*

Thompson challenges both the legal and factual sufficiency of the evidence presented in support of termination of his parental rights. Specifically, he asserts that mere incarceration is not enough to support a finding of termination. The Department suggests that it used Thompson=s incarceration as proof of but one element of a course of conduct exhibited by Thompson which endangered his children.

Termination must be based on more than a single act or omission; a voluntary, deliberate, and conscious Acourse of conduct@ by the parent is required. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.CFort Worth 2000, pet. denied)*; In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.CEastland 1999, no pet.); *In re J.N.R.*, 982 S.W.2d 137, 142 (Tex. App.CHouston [1st Dist.] 1998, no pet.), *disapproved on other grounds, C.H.*, 2002 Tex. LEXIS 113, at *25. Imprisonment, standing alone, does not constitute Aengaging in conduct which endangers the emotional or physical well-being of the child.@ *Boyd*, 727 S.W.2d at 533-34; *see also* Tex. Fam. Code Ann. ' 161.001(1)(E). However, it is a fact properly considered on the issue of endangerment. *Boyd*, 727 S.W.2d at 534; *D.T.*, 34 S.W.3d at 636. The State need not show incarceration was a *result* of a course of conduct endangering the child; it need only show incarceration was part of a course of conduct endangering the child. *See J.N.R.*, 982 S.W.2d at 142-43. Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, the requirement of section 161.001(1)(E) is met. *Boyd*, 727 S.W.2d at 533-34.

The Department presented evidence that Thompson was convicted of theft, forgery, burglary, and criminal mischief in 1983, 1986, and 1995, and charged with burglary in 1988 and 1994. At the time of trial, he had served four years of a thirty-five year sentence for criminal mischief. Due to his lengthy incarcerations and admitted problems with drugs and alcohol, Thompson visited with his children just once since their infancy. He testified that during this visit, he noticed that the children were wearing dirty clothes and smelled of urine. He admitted to being concerned about his children=s well-being at the time, yet failed to act until 1999 when he voiced his concerns in a letter to one of the Department=s caseworkers.

In 1996, a court order establishing the paternity of Thompson was issued. The order requires Thompson to pay child support to Garcia. Thompson testified that he failed to make any payments because he was unaware of the order. Although eligible for parole in 2002, Thompson and the State both estimated that he will be incarcerated until at least 2011.[5] By that time, his children, A.T. and T.T., will be 23 and 22 years old, respectively. Despite this, Thompson suggests that once he is released, he will obtain gainful employment and support his children appropriately. In the interim, he considers it to be in the children=s best interest to return home to live with Garcia. However, as we have already established, the evidence is factually sufficient to support the jury=s determination that the best interest of the children will not be served by their return to Garcia.

---

[5] On redirect examination, Thompson testified that it would be a Amiracle@ if he got out of prison soon and agreed that he would not get out while A.T. and T.T. were still under the age of eighteen.

14

The evidence adduced at trial reveals the following: (1) Thompson has a history of drug and alcohol abuse; (2) Thompson failed to act promptly on his own concerns for his children=s well-being; (3) Thompson has failed to participate in his children=s lives in any significant way since their infancy; (4) Thompson repeatedly committed crimes after the birth of his children despite his knowledge that if convicted, he would be incarcerated and therefore unable to provide for his children; (5) Thompson will be unable to financially support his children throughout the remainder of their childhood; and (6) Thompson=s ideal future placement of his children would be in Garcia=s home. We hold that this evidence is both legally and factually sufficient under the new standard announced in *C.H.* to support the jury=s finding that Thompson participated in a course of conduct that had the effect of endangering his children. Thompson=s first point of error is overruled.

Thompson relies on the testimony of his two children that they wish to return to Garcia to support his argument that termination of his parental rights is not in their best interest. The Department presented Rosa Hernandez and Elida Perez, both of whom testified that it would be in the best interest of the children for Thompson=s parental rights to be terminated.

When determining whether termination is in the best interest of a child, the trial court may consider not only the wishes of the children, but emotional and physical needs of the children now and in the future, emotional and physical danger to the children now and in the future, acts or omissions of the parent, and any excuse for the acts of omissions of the parent. *See Holley,* 544 S.W.2d 367. In light of these considerations, we hold that the evidence adduced at trial regarding the plight of Thompson=s children was both legally sufficient and factually sufficient under the new standard announced in *C.H.* to support a finding

that termination of his parental rights was in A.T. and T.T.=s best interest.  Thompson=s second point of error is overruled.

*Attorney ad Litem=s Conflict of Interest*

Garcia contends that the attorney *ad litem* appointed to represent her children had a conflict of interest in representing all seven children.  Because two of the children, A.T. and T.T., wanted to be returned to Garcia, and the other five did not, Garcia asserts that it was impossible for the attorney *ad litem* to effectively discharge his legal obligation to all the children.  In presenting her argument, Garcia provides no authority to support her claim.  *See* Tex. R. App. 38.1(h).  Points of error must be supported by argument and authority, and if not so supported, are waived.  *Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex. 1983).  Furthermore, our review of the record reveals that the attorney *ad litem* was an effective advocate for each child.  Garcia=s final point of error is overruled.

**CONCLUSION**

We hold that the evidence was such that the fact finder could reasonably form a firm belief or conviction as to the truth of the State=s allegations, and thus factually sufficient to support the jury=s findings that both Garcia and Thompson engaged in endangering conduct under section 161.001 of the family code and that termination of the rights of both parents was in the best interest of the children.  In addition, we hold that the evidence was legally sufficient to support the same findings with regard to Thompson.  We therefore affirm the decree of termination of the trial court.

16

David Puryear, Justice

Before Chief Justice Aboussie, Justices Yeakel and Puryear

Affirmed

Filed:   August 30, 2002

Do Not Publish